**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:24CR261 MTS (SPM) |
| | ) | |
| GERALD BIRCHFIELD - 16 | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION AND**
**MEMORANDUM OPINION OF**
**UNITED STATES MAGISTRATE JUDGE**

All pretrial motions in the above cause were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). Currently before the Court is Defendant Gerlad Birchfield's Motion to Suppress Evidence from Wiretaps (ECF No. 926) ("Defendant's Motion"), which is opposed by the United States. ECF No. 1177. The undersigned has carefully considered Defendant's Motion, the applicable law, the parties' written submissions and the evidence presented by both parties. For the reasons more fully discussed below, the undersigned recommends that Defendant's Motion be denied.

**BACKGROUND AND PROCEDURAL HISTORY**

Defendant Gerald Birchfield is the sixteenth of twenty-nine defendants charged in an indictment with drug-trafficking related crimes. Birchfield is charged in Count One with conspiracy to distribute and possession with the intent to distribute controlled substances including unspecified quantities of fentanyl and methamphetamine. ECF No. 2. He was arrested and made his first appearance on June 4, 2024. Following Birchfield's initial appearance and arraignment, this Court entered an order granting the United States' Motion for Complex Case Designation and To Continue the Trial Date Beyond Limits Set by the Speedy Trial Act. ECF No. 408. After this Court granted several requests to continue the deadline for filing pretrial motions, Defendant's Motion was filed on October 13, 2025. Because several of Birchfield's

co-defendants were also considering filing pretrial motions at the time, the Court, in the interest of justice and judicial economy, granted the United States time, through May 4, 2026, to file its response. *See* ECF Nos. 943, 1090, and 1162. On May 4, 2026, the United States filed its response opposing Defendant's Motion. ECF No. 1177.

On May 11, 2026, this Court entered an order setting an evidentiary hearing on Defendant's Motion for June 3, 2026. ECF No. 1186. On June 3, 2026, Birchfield appeared with counsel, and the United States was represented by Assistant United States Attorney Dane Rennier. At the hearing, the parties asked the Court to accept a joint written stipulation of facts in lieu of an evidentiary hearing. ECF No. 1203. The United States also submitted two affidavits in support of the Title III wiretaps at issue without objection by the defendant. ECF No. 1204. Neither party requested leave to file post-hearing briefs and Defendant's Motion was taken under submission following the hearing. Upon reviewing the parties' submissions, this Court determined that both parties referred to documents in their written submissions that were not part of the evidentiary record. As such, on June 22, 2026, the undersigned entered an order directing the parties to supplement the record with the missing evidence by no later than June 23, 2026. ECF No. 1217. The parties complied with this Court's June 22nd Order by timely submitting the following additional exhibits: Application for Initial Interception of Wire and Electronic Communications, dated June 23, 2023, Govt. Ex. 1A; Order Authorizing the Interception of Wire and Electronic Communications, dated June 23, 2023, Govt. Ex. 1C; Application for Continued Interception of Wire and Electronic Communications, dated July 25, 2023, Govt. Ex. 2A; Order Authorizing the Continued Interception of Wire and Electronic Communications, dated July 25, 2023, Govt. Ex. 2C; and six Ten-Day Reports, Deft. Ex. A.

Based upon the evidence presented, the parties' written submissions, and applicable law, I make the following findings of fact and conclusions of law.

## I.    FINDINGS OF FACT

The evidence shows that the United States conducted court ordered electronic surveillance during the investigation of the matters alleged in the indictment. The joint stipulation by the parties reflects that the United States obtained two separate orders relevant to the instant motion. ECF No. 1203. The first order authorized the *initial* interception of wire and electronic communications for phone numbers (314) 390-7773 and (314) 354-0294. *Id.* The second order authorized the *continued* interception of wire and electronic communications for the same two phone numbers. *See id*. The applications for both orders were supported by affidavits by DEA Task Force Officer James Gaddy. *Id.*

### A.    *June 23, 2023, Application and Affidavit in Support of Application for the Initial Interception of Wire and Electronic Communications*

On June 23, 2023, Assistant United States Attorney Dane Rennier appeared before United States District Judge Sarah E. Pitlyk and made an application for interception of wire communications over telephone number (314) 390-7773, International Mobile Subscriber Identity ("IMSI") 310260058247962 (referred to in the application as "Target Telephone #4") and telephone number (314) 354-0294, IMSI 310260060010550 (referred to in the application as Target Telephone #5). *See* Govt. Ex. 1A. The application was accompanied by and referenced the affidavit of James Gaddy, a Task Force Officer with the Drug Enforcement Administration (DEA) ("TFO Gaddy"). TFO Gaddy also appeared before Judge Pitlyk on June 23, 2023, and swore to and signed the affidavit. *See* Govt. Ex. 1.

In his affidavit, TFO Gaddy attested that the DEA was investigating a Mexican-based drug-trafficking organization that was connected to a drug trafficking organization investigators believed was operating in the St. Louis Metropolitan area. *See* Govt. Ex. 1, ¶19. The affidavit listed several targets as subjects of the investigation, including Birchfield's co-defendant Javier Ramos-Garcia, who investigators believed was a substantial distributor of methamphetamine, based on intercepted communications, surveillance, and undercover purchases. *See id.* at ¶¶11, 19 & 22. Birchfield was not listed as a target.

The affidavit asserted that, based on the investigation, target telephones #4 and #5 were known to be used by Ramos-Garcia. *Id.* at ¶4. More specifically, in the probable cause section of the affidavit, TFO Gaddy attests that in January 2023, investigators learned that co-defendant Theodore "Ted" Sigite was a substantial St. Louis based distributor of methamphetamine and fentanyl sourced from members of a Mexican-based drug cartel. *Id,* at ¶24. Investigators identified Ramos-Garcia through surveillance and learned of target phone # 4 in April 2023 from a confidential source, CS-4. *Id.* at ¶26. In May 2023, investigators used CS-4 to arrange a controlled purchase between Ramos-Garcia and an undercover agent. CS-4 received a call from target phone # 4 and spoke with Ramos-Garcia, who told CS-4 to meet at a Home Depot parking lot in St. Louis. *Id.* at ¶30. Investigators established surveillance at the Home Depot and saw Ramos-Garcia arrive that afternoon. *Id.* at ¶¶31-32. Ramos-Garcia called CS-4 using target phone # 4 and said he had arrived at the Home Depot. *Id.* at ¶33. The undercover investigator then went to Ramos-Garcia to conduct the drug transaction and then delivered the methamphetamine to DEA investigators. *Id.* at ¶¶33-34.

When Ramos-Garcia left the Home Depot, investigators surveilled him. *Id.* at ¶35. They saw Ramos-Garcia drive to another part of St. Louis and then pull over and remain stationary for a short time, and then he drove to a pizzeria parking lot for a short while. *Id*. He then drove to an address on January Avenue in Ferguson, Missouri, which is the registered address for the Chevy Silverado that Ramos-Garcia was driving. *Id.* During this transaction at the Home Depot, Ramos-Garcia gave the undercover investigator a new phone number, target phone # 5, and told the undercover investigator to use target phone # 5 for future transactions. *Id.* at ¶36.

On May 30, 2023, TFO Gaddy directed the undercover investigator to call target phone  # 5 to arrange a purchase of methamphetamine. *Id.* at ¶37. When the undercover investigator called that target phone, Ramos-Garcia said he was going to Indiana the next morning but would return in the late afternoon and would call the undercover investigator when he got back. *Id.* During the recorded call, the undercover investigator and Ramos-Garcia discussed purchase frequency and price, and Ramos-Garcia

suggested that the undercover investigator consider getting a kilogram instead of a pound and offered to get permission from his "boss" to "front" or supply the methamphetamine on consignment. *Id.* at ¶37.

The next day, investigators learned that License Plate Readers (LPRs) had captured Ramos-Garcia's license plate in Indianapolis, and he appeared to stay about 31 minutes before returning toward St. Louis. *Id.* at ¶38-39. Around 4:45 that afternoon, Ramos-Garcia left his January Avenue residence and used target phone # 5 to call the undercover investigator and told him to meet at Home Depot in an hour. *Id.* at ¶40. Investigators followed Ramos-Garcia from his residence but conditions in the neighborhood streets Ramos-Garcia travelled made the operation so risky that investigators decided to stop surveillance of Ramos-Garcia's vehicle and focused instead on establishing surveillance at the Home Depot where Ramos-Garcia was headed. *Id.* at ¶¶42-43. Investigators at the Home Depot saw Ramos-Garcia arrive and park, and he then used target phone # 5 to text the undercover investigator that he had arrived. *Id.* at ¶44. The undercover investigator arrived at the Home Depot, parked next to Ramos-Garcia's car, and then entered Ramos-Garcia's car. *Id.* at ¶45. During a monitored conversation between the undercover investigator and Ramos-Garcia, Ramos-Garcia indicated he had transported about 15 kilograms of methamphetamine to Indiana for a courier fee of $4,500 and that he did so about every 10 days. *Id.* Ramos-Garcia said that his next trip would include collecting drug proceeds from the sale of the 15 kilograms. *Id.* The undercover investigator received one kilogram of methamphetamine from Ramos-Garcia for $2,000 with about one-half of the methamphetamine being provided on consignment. *Id.* At the conclusion of the transaction, Ramos-Garcia bragged that the DTO has abundant amounts of drugs at their disposal. *Id.* Investigators surveilled Ramos-Garcia as he left the Home Depot and, because Ramos-Garcia was engaging in counter-surveillance maneuvers, investigators were able to maintain moving surveillance only with the assistance of DEA air support. *Id.* at ¶46.

Regarding necessity, TFO Gaddy attested that the objective of the investigation was to obtain evidence to fully prosecute the target subjects identified in the affidavit and others yet unknown to investigators. *Id.* at ¶51. The affidavit also asserts that interception of communications over target

phones 4 and 5 would enable investigators to further the goals and objectives of the investigation. *Id.* TFO Gaddy further attested that based on the investigation and his experience with drug trafficking investigations drug traffickers utilize and maintain multiple cellular devices to thwart law enforcement investigations and compartmentalize those devices by echelons within the drug trafficking organization. *Id.* For example, TFO Gaddy noted he believed target phone # 5 is correlated to lower-level customers or distributors, while target phone # 4 is for more trusted associates of the DTO. *Id.* TFO Gaddy then discussed various investigative techniques that either had been attempted and failed, or reasonably appeared unlikely to succeed, or were too dangerous to employ. *Id.* at ¶¶53-111. These techniques included physical surveillance, confidential informants and undercover agents, grand-jury and administrative subpoenas, interviews of subjects or associates, search warrants and consensual searches, pen registers and toll records, mobile tracking devices and location information, trash seizures, financial investigations, pole cameras, recent court-authorized wire interceptions, and other investigations. *Id.*

On June 23, 2023, Judge Pitlyk signed an Order authorizing the interception of wire communications of Target Telephone #4 and #5. *See* Govt. Ex. 1C. The Order states that the Court found probable cause to believe that the target subjects and others as yet unknown were committing the listed offenses including distribution and possession with intent to distribute methamphetamine and fentanyl in violation of 21 U.S.C. §841(a)(1); conspiracy to distribute methamphetamine and fentanyl and possession with intent to distribute methamphetamine and fentanyl in violation of 21 U.S.C. § 841(a)(1), 846; the unlawful use of a communication facility to facilitate distribution of a controlled substance in violation of 21 U.S.C. §843(b); and money laundering in violation of 18 U.S.C. § 1956 and 1957. *Id.* The Order further found probable cause to believe that intercepted communications will concern the listed target offenses and are expected to constitute admissible evidence of the commission of the listed target offenses. *Id.* The Order found "it ha[d] been adequately established" that normal investigative techniques had been tried and had failed, reasonably appeared to be unlikely to succeed if tried, or were too dangerous to be employed. *Id.* The order authorized wiretap interception for thirty (30) days and ordered AUSA Rennier

- 6 -

or any other Assistant United States Attorney familiar with the facts of the case provide the Court with reports every ten days following the date of the Order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception (Ten-Day Reports). *Id.*

**B.**     ***July 25, 2023, Application and Affidavit for the Continued Interception of Wire and Electronic Communications***

On July 25, 2023, Assistant United States Attorney Dane Rennier appeared before United States District Judge Matthew Schelp and applied for the continued interception of wire and electronic communications over target phones # 4 and # 5. *See* Govt. Ex. 2A. AUSA Rennier was accompanied by TFO Gaddy, who also appeared and signed and swore to an affidavit in support of the application. *See* Govt. Exh. 2. The probable cause section of the affidavit included the same background about the investigation that appeared in the June 23rd affidavit and included information that investigators learned while the June 23rd wiretap was active. For example, the affidavit states that on June 30, investigators intercepted calls and messages between target phone # 4 and a number ending in -6816 discussing a pending drug transaction for $35,000. Govt. Ex. 2, at ¶28. Investigators then surveilled Ramos-Garcia's movements electronically and in person and observed a suspected drug transaction in a Motel 6 parking lot. *Id.* at ¶¶ 28-29. Later that day, investigators observed Ramos-Garcia engage in what they believed to be transfer of drug proceeds. *Id.* at ¶¶ 30-31.

Regarding target phone # 5, TFO Gaddy attested that on June 28, 2023, target phone # 5 received a drug related call from co-defendant Sotelo-Perez, and in response investigators set up surveillance of Ramos-Garcia. *Id.* at ¶¶ 38-39. The affidavit attests that poor readings from GPS coordinates from target phones # 4 and # 5 and technical malfunctions from the GPS tracker attached to Ramos-Garcia's truck, investigators temporarily lost contact with Ramos-Garcia but then later found him at a restaurant parked next to a car belonging to Sotelo-Perez. *Id.* at ¶¶ 40-41. Investigators surveilled Ramos-Garcia and Sotelo-Perez (with two passengers) as they each drove their separate cars to Ramos-Garcia's residence and went inside. *Id.* at ¶¶ 42. Sotelo-Perez and his two passengers left Ramos-Garcia's house and drove

away in Sotelo-Perez's car which investigators then stopped in a traffic stop. *Id.* at ¶¶ 43-44. A consent search of Sotelo-Perez's car recovered about $96,000 in cash. *Id.* at ¶¶ 44. About two hours later, Sotelo-Perez called Ramos-Garcia over target phone # 5 and the two discussed the traffic stop. *Id.* at ¶ 45. In the affidavit, TFO Gaddy details other use of target phone # 5 for drug-related communications on July 12 and 13, 17, and 19, 2023. *Id.* at ¶¶ 46, 47, 50, 51.

Regarding necessity, TFO Gaddy reiterated the goals and objectives of the investigation as well as the investigative team's reasons for requesting continued surveillance. Specifically, TFO Gaddy noted problems with the electronic devices that investigators used to track Ramos-Garcia. The affidavit also notes the devices malfunctioned during surveillance on June 28, 2023, when Ramos-Garcia went to Illinois. *Id.* at ¶ 55. The GPS tracker continuously malfunctioned on July 13, 2025, while investigators tracked Ramos-Garcia for a pending drug transaction. *Id.* TFO Gaddy further attested that although physical surveillance had proven to be of some value in identifying certain activities and associates of target subjects, limitations posed by countersurveillance maneuvers like those described in the June 23rd affidavit thwarted investigators' efforts to fully utilize physical surveillance. *Id.* at ¶ 56. The affidavit further explained that while physical surveillance helped investigators to identify Ramos-Garcia, it was of limited value because it did not lead to the identification of Ramos-Garcia's sources of supply and other unknown targets. *Id.* at ¶¶56-57. TFO Gaddy also attested to the limitations of physical surveillance given the fact that this investigation involves a sprawling network of drug traffickers; involves illegal activity in urban areas known and controlled by members of the drug trafficking organizations; and involves a large geographical distance between locations where members of the drug trafficking organization transport and distribute narcotics and currency (members located in Mexico, St. Louis, Indianapolis, Raleigh, Oklahoma City, Memphis, and elsewhere). *Id.* at ¶¶ 58-61. TFO Gaddy similarly detailed limitations with the use of other investigative tools including confidential sources and undercover agents, grand jury and administrative subpoenas, interviews of subjects or associates, search warrants and consensual searches, pen registers and toll records, mobile tracking devices and location

information, trash seizures, financial investigations, pole cameras, recent court-authorized wire interceptions, and other investigations. *Id.* at ¶¶ 75-112.

On July 25, 2023, Judge Schelp signed an order authorizing continued interceptions on target phones # 4 and # 5 for no more than 30 days. *See* Govt. Ex. 2C. The Order states that the Court found probable cause to believe that the target subjects and others yet unknown were committing the same offenses listed in the June 23rd Order. *Id.* The Order further found probable cause to believe that particular wire and electronic communications concerning the target offenses will be obtained through the continued interception of wire and electronic communications occurring to and from target phones # 4 and # 5. *Id.* The Order found "it ha[d] been adequately established" that normal investigative techniques had been tried and had failed, reasonably appeared to be unlikely to succeed if tried, or were too dangerous to be employed. *Id.* The order authorized wiretap interception for thirty (30) days and ordered AUSA Rennier or any other Assistant United States Attorney familiar with the facts of the case provide the Court with Ten-Day reports showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. *Id.*

### C.   *Interceptions of Birchfield's Phone*

AUSA Rennier submitted Ten-Day Reports for target telephones 4 and 5 on July 7, 2023, July 18, 2023, July 25, 2023, August 7, 2023, August 15, 2023, and August 25, 2023. *See* Deft. Ex. A. A telephone number associated with Birchfield— (314) 437-7546—was intercepted on target telephone # 5 in July and August of 2023. *See* ECF No. 926, p. 7-8; s*ee also* Deft. Ex. A, Second Ten-Day Report, session no. 481; Fifth Ten-Day Report, session nos. 1055, 1056, 1085, 1092 and 1093.

### II.   CONCLUSIONS OF LAW

The foregoing factual findings and Birchfield's own submissions reflect that, between July and August 2023, wire and/or electronic communications between a Birchfield-related phone number, (314) 437-7546, and target phone # 5 were intercepted pursuant to the orders issued by Judges Pitlyk and Schelp. Birchfield argues that all evidence obtained by means of the court authorized interceptions must

be suppressed because the affidavits of TFO Gaddy submitted in support of the authorization failed to satisfy the necessity requirement set out in 18 U.S.C. §§2518(1)(c) & (3)(c).  Other than necessity, Birchfield does not challenge the propriety of the court authorized interceptions.

### A.  Birchfield Lacks Standing to Challenge Evidence Seized from Target Phone # 4

Under 18 U.S.C. §2518(10)(a)(i), "[a]ny aggrieved person . . . may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom," on the ground that the communication as unlawfully intercepted. Section 2510(11) defines the term "aggrieved person" as any "person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." In interpreting these provisions of the wiretap statute, the Eighth Circuit has held that "a defendant may challenge evidence gathered pursuant to an interception order only if it is shown that it was directed at him, that the Government intercepted his conversations, or that the wiretapped communications occurred at least partly on his premises."  *United States v. Civella,* 648 F.2d 1167, 1171 (8th Cir. 1981) (quoting *United States v. Williams*, 580 F.2d 578, 583 (D.C. Cir. 1978), cert. denied, *Lincoln v. U.S.,* 439 U.S. 832 (1978)). This rule stems from the well-established principle that "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself not by those who are aggrieved solely by the introduction of damaging evidence." *Id.* at 1172.

Based on the foregoing factual findings and the evidence of record, Birchfield was not named as a target of the investigation in either the June 23rd application and supporting affidavit or the July 25th application and supporting affidavit. Birchfield's own written submissions appear to concede that the investigators did not intercept any of his communications over target phone # 4, and there is no evidence of record suggesting that any of the wiretapped communications over target phone # 4 occurred at least partly on Birchfield's property. As such, before even reaching the merits of Birchfield's motion, this Court finds Birchfield has failed to demonstrate that he is entitled to an order suppressing any communications or evidence derived from communications intercepted over target phone # 4.

## B. Birchfield's Necessity Challenge is not supported by the Evidence

Even if there is evidence in the record that would allow Birchfield to make a Fourth Amendment challenge to communications seized from target phone # 4, Birchfield's motion to suppress fails on the merits. As noted above, Birchfield's sole challenge to the propriety of the court-authorized interceptions is his argument that the affidavits of TFO Gaddy failed to satisfy the necessity requirement set out in 18 U.S.C. §§2518(1)(c) & (3)(c).  Under 18 U.S.C. §2518(1)(c), each application for a wiretap authorization must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *See United States v. Turner,* 781 F.3d 374, 382 (8th Cir. 2015) (quoting 18 U.S.C. § 2518(1)(c)). Section 2518(3)(c) similarly requires that in issuing a wiretap authorization order, the district court must determine whether "normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried or to be too dangerous." *See United States v. West,* 589 F.3d 936, 939 (8th Cir. 2009) (quoting 18 U.S.C. § 2518(1)(c)). Together, these sections make up the necessity requirement for granting an order to receive wire interceptions from a phone. *See, e.g.*, *United States v. Kahn*, 415 U.S. 143, 153 n. 12 (1974) (holding that these two provisions "require the application to demonstrate, and the judge authorizing any wire interception to find, that 'normal investigative procedures' have either failed or appear unlikely to succeed").

It is well established that although wiretaps should not be "routinely used as the initial step in an investigation," the necessity requirement "does not require that law enforcement exhaust all possible techniques before applying for a wiretap." *Turner,* 781 F.3d at 383.  "If law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each co-conspirator, the necessity requirement is satisfied." *Id.* at 382. Indeed, the Eighth Circuit has held that demonstration of necessity does not require that conventional investigative techniques have been *completely* unsuccessful or that *all* possible alternatives have been exhausted. *See United States v. Mims*, 122 F.4th 1021, 1029 (8th Cir. 2024), cert. denied, 145

- 11 -

S. Ct. 2861 (2025) (noting that "[l]aw enforcement does not have to 'exhaust every available investigative technique[]'" and "[a] wiretap does not have to be the 'last resort'") (quoting *United States v. Merrett*, 8 F.4th 743, 749 (8th Cir. 2021)); see also *United States v. Thompson,* 690 F.3d 977, 986 (8th Cir. 2012) ("We have interpreted this requirement to restrict wiretaps to situations in which they are necessary as well as reasonable, but not to require the government to show the exhaustion of 'specific' or 'all possible' investigative techniques before wiretap orders could be issued.") (internal quotations marks, brackets, and citation omitted). Rather, the necessity requirement merely ensures "that wiretaps are not routinely employed as the initial step in an investigation." *United States v. Jackson,* 345 F.3d 638, 644 (8th Cir. 2003) (quoting *United States v. Maxwell,* 25 F.3d 1389, 1394 (8th Cir. 1994) (internal quotation marks omitted). "Whether the statutory requirement is met is to be determined by the issuing judge in a commonsense manner, and the determination is a finding of fact, which can be reversed only if clearly erroneous." *United States v. Thompson*, 690 F.3d 977, 986 (8th Cir. 2012) (quoting *United States v. Macklin*, 902 F.2d 1320, 1327 (8th Cir.1990)).

Here, based on the foregoing factual findings, investigators did not use a wiretap as the initial step in the investigation. The affidavits TFO Gaddy submitted in support of both the initial wiretap authorization and the continued authorization described various techniques used by law enforcement officials to gather evidence in the case. Both affidavits described in detail why some investigative techniques such as physical surveillance and the use of GPS technology helped to advance the investigation but were of limited value given the scope and scale of the illegal activities being investigated, limitations of other investigative tools, and the geographic and logistical circumstances under which investigators operated. The affidavit explained that the use of various techniques had failed to fully reveal the full scope of the conspiracy, its complete membership, and methods of operation. In sum, Defendant Birchfield's motion to suppress electronic surveillance evidence should be denied because the facts contained in both affidavits were sufficient to meet the necessity requirement.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence from Wiretaps (ECF No. 926) be **DENIED**.

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated: June 30, 2026.


_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE